## JOHN B. DEVILLERS *v.* SCHOONER JOHN BELL et al.

Where a vessel undertakes to transport merchandise from one place to another, giving a bill of lading in the usual form, in case a re-shipment becomes necessary, she is bound to employ a seaworthy vessel. If the goods be lost in consequence of the unseaworthiness of the vessel on which they were re-shipped, the vessel originally employed will be held liable for their value. But if she had only contracted to carry the goods from one point to another, from which latter place they were to be re-shipped, the vessel is only liable as a forwarder of merchandise, and is only bound to exercise ordinary care in procuring a proper conveyance for the goods.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. In this case, *Francisco Del Camino* intervened, and also claimed damages for goods shipped on the John Bell, which were lost.

*Durant* and *Hornor,* for plaintiff. *Benjamin* and *Micou,* for defendants.

The judgment of the court was pronounced by

SLIDELL, J. These are suits to recover the value of goods shipped on board the schooner John Bell, at New Orleans, " bound," as the bill of lading states, "for Brownsville, Texas," and "to be delivered in the like good order and condition at the port of Brownsville, Texas, the dangers of the seas and navigation only excepted, unto," &c. The freight to be paid is stated in the usual form ; and consequently covers the entire transportation from New Orleans to Brownsville. The material facts presented by the testimony are as follows: The vessel arrived at the port of Brazos St. Jago on Thursday, the 29th November. For several days after her arrival, the weather was so boisterous as to prevent her discharging her cargo. On the following Wednesday, she commenced discharging. There was no warehouse at the port, nor any lighters in which the cargo could be stored or deposited. There was no steamer or other vessel bound for Brownsville, except the steamer J. E. Roberts, which was then taking in goods from other vessels lying in port; and, under these circumstances, the captain was compelled, he says in his protest, to *re-ship* in her such portion of his cargo as was destined for Brownsville. The steamer left the Brazos about sunrise, on the 8th December, for Brownsville, via the mouth of the Rio Grande, with a full cargo; and about twelve o'clock, on the same day, was wrecked near the beach, about midway between Brazos and the mouth of the Rio Grande. It is not shown, that the loss was occasioned by stress of weather. It is proved, that the steamer was rotten and unseaworthy; and that such was the condition of all the other steamers employed on the Rio Grande, except the Colonel Hunt, which, at the time, was laid up at the mouth of the Rio Grande. The J. E. Roberts had been crossed, as it is termed, by the inspector for the New Orleans underwriters, and had been advertised as such by them in the Brownsville and New Orleans newspapers, in October, 1849. Whether the captain of the John Bell knew this, does not appear. According to the testimony, "the course of trade between New Orleans and Brownsville is, that the vessels discharge at Brazos San Jago, and goods are taken in lighters from Brazos up the river to Brownsville, or are taken in lighters to Point Isabel, and then by land to Brownsville. When the bills of lading are signed, the goods deliverable at the Brazos, the consignees send a clerk there to take delivery of them. If

the bill of lading is for Brownsville, it is the captain's business to attend to forwarding them; he cannot collect the freight until the goods are delivered at Brownsville."

DEVILLERS<br>v.<br>SCHOONER<br>JOHN BELL.

There was judgment in favor of the defendants, and the plaintiff and intervenor have appealed.

By the bill of lading, the undertaking of the defendants was clear and unequivocal. It was, to carry the goods to Brownsville, and deliver them there to the consignees. Nor is there any thing in the parol evidence, supposing that it ought to be considered, to impair the effect of that undertaking. From that evidence it appears that, in case of goods deliverable at Brownsville, consignees take no delivery of the goods until their arrival there; and the duty of transporting them to that point, by lighter, is at the vessel's expense. Giving the defendants the benefit of the parol evidence, it amounts to no more than to interpolate, in the bill of lading, a permission to the captain of the vessel to employ, at his own expense and risk, ("the dangers of the seas and navigation only excepted,") some other conveyance to carry the goods from Brazos to Brownsville.

Under such a contract, what is the responsibility of the carrier? Is he a common carrier only to the point where the new means of conveyance are employed, or does that character adhere to him until delivery at the place of destination? The rule of law is, in our opinion, well settled, that he remains a common carrier until such delivery, and is liable as such.

Thus, in *Muschamp* v. *Lancaster and Preston Railway Company*, 8 M. and Welsb., 421, (as cited by Mr. Angell, in his Treatise on the Law of Carriers,) a parcel was delivered at Lancaster to the railway company, directed to a person at a place in Derbyshire. The person who brought it to the station offered to pay the carriage, but the book-keeper said it had better be paid by the person to whom it was directed, on the receipt of it. The company were known to be the proprietors of the line only as far as Preston, where the railway unites with another line called the North Union Line, and that, afterwards, with a third line, and so on to Derbyshire. The parcel having been lost after it was forwarded from Preston, it was held, that the company were liable for the loss.

So, in the case of *Weed* v. *Schnectady and Saratoga Railroad Company*, 19 Wendell, 537, it was held, that the defendants, having undertaken to carry from the Springs to Albany, could not be received to say that they were, in truth, carriers no further than Schnectady, the termination of their own road.

So, in *St. John* v. *Van Santvoord et al.*, 25 Wendell, the defendants, who were common carriers employed in the transportation, in towboats, of goods on the Hudson river, between New York and Albany, received a package directed to Little Falls, a place beyond Albany, and gave a receipt for it in these words: "New York, October 22, 1826. Received from St. John and *Tonsey*, on board of towboat Ontario, one box of merchandise, marked '*J. Petrie*, Little Falls, Herkimer county.'" They were held liable for the loss of the goods happening after their delivery to other carriers, who paid them the freight to Albany; the court observing, that if the defendants had intended to limit their duty, as common carriers, short of the place of destination, they should, in some way, have indicated to plaintiffs such intent.

It will be observed, that in two of these cases there was no express agreement to carry beyond the carrier's own line; yet from the receipt of the goods addressed to the ulterior place, an agreement was implied to deliver them at that place. Here, there was an express agreement to deliver at Brownsville.

69

These cases are very different from those where the carrier undertakes to convey the goods to a certain point, and forward them thence to the place of destination. In such case, he is regarded as a carrier to that point, and beyond it as merely a forwarder, who is only liable for ordinary care in procuring a proper convenience for the goods. See *St. John* v. *Santvoord*, 25 Wendell, 662. *Garside* v. *Trent and Mersey Navigation Company*, 4 T. R. 581. Story on Bailments, § 538.

The counsel for the defendants has referred us to the custom in the river Thames, respecting delivery to lighters, as stated in Angell on Carriers, § 308. But we are unable to see any analogy to the present case. For there, it seems, the lighter is sent by the consignee to receive the goods, and the liability of the master continues until the goods are laden on board the lighter. In the present case, the consignee was to have nothing to do with the goods until their arrival at Brownsville. See also *Whitesides* v. *Russell*, 6 Watts and Sergeant, 48, citing 6 and 7 Ohio, 143. 2 Scammond, 288.

Being, therefore, of opinion that, under their contract, the defendants made themselves liable, in the character of common carriers, until the goods should be delivered at Brownsville, the solution of the question of liability for this loss easily follows.

As common carriers, they were insurers against everything but the perils excepted by law and the contract. He who undertakes to transport by water, for hire, is bound to provide a vessel sufficient in all respects for the voyage. The goods which the defendants undertook to transport and deliver at Brownsville, not having been delivered there, but lost on the route, the *onus probandis* is on them to exempt themselves from liability. On the one hand, the proof is clear that the vessel, by which they attempted to transmit the goods from the Brazos to Brownsville, was rotten and unseaworthy; on the other, there is no evidence to show that there was such violence of the winds and waves or other perils of the sea encountered, as would have wrecked a sound and seaworthy vessel. It is, therefore, just to infer that the loss happened from the insufficiency of the steamer for the voyage. See *Davis* v. *Garrett*, 6 Bingham, 716. *Hart* v. *Allen*, 2 Watts, 114.

It is no excuse to the defendants, that the Roberts was the only vessel they could procure at the time. Under their contract, they were bound to deliver the goods at Brownsville, and there was no qualification that they might be permitted to use an unseaworthy vessel, if none other was to be had at the time. For the purposes of their liability as carriers, the Roberts was as much their vessel as the John Bell. Both were the instruments used by themselves to perform their contract, and earn the entire stipulated freight for the transportation from New Orleans to Brownsville.

It is therefore decreed, that the judgment of the district court be reversed, and that this cause be remanded for a new trial, and for further proceedings according to law; the defendants to pay the costs of the appeal.